**SILLS CUMMIS & GROSS P.C.**
James Hirschhorn, Esq.
Mary E. Toscano, Esq.
S. Jason Teele, Esq.
Daniel J. Harris, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000 (Telephone)

*Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.* [1]<br><br>           Debtors. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>(Jointly Administered) |
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>           Plaintiff,<br><br>v.<br><br>U.S. CONSTRUCTION, INC. d/b/a U.S. CONSTRUCTION, DEVELOPMENT AND DESIGN, INC., DUSTIN SALZANO, JOHN FARINA, PREMIER ACCESS PROPERTY MANAGEMENT, INC. and JOHN DOES 1-100,<br><br>           Defendants. | Adv. Pro. No. 22-01257 (JKS) |

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA. The location of the Debtors' service address is: 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

## AMENDED ADVERSARY COMPLAINT[23]

Plaintiff, National Realty Investment Advisors, LLC ("NRIA" or "Plaintiff")[4] on behalf of itself and its affiliates (together with NRIA, collectively, the "Debtors"), by and through its undersigned counsel, by way of this amended complaint (the "Amended Complaint") against (i) U.S. Construction, Inc. d/b/a U.S. Construction, Development and Design, Inc., ("US Construction"), (ii) Dustin Salzano, (iii) John Farina ("Farina"), (iv) Premier Access Property Management, Inc. ("Premier" or "Premier Access") and (v) any employees, officers, managers and/or directors of US Construction and/or any subsidiaries or affiliates of US Construction as may be subsequently discovered ("John Does 1-100") ((i) through (iv) collectively, the "Defendants"), avers as follows:

## INTRODUCTION[5]

1.      This Amended Complaint arises from the Defendants' participation in the scheme promulgated by the Debtors' former owners and related parties to defraud investors. As set forth

---

[2]      The Civil Action captioned *National Realty Investment Advisors, LLC v. US Construction Inc., US Construction & Development LLC, John Farina, and John Does 1-10* at Docket No. HUD-L-000959-22 that was pending in the Superior Court of New Jersey Law Division – Hudson County, has been removed and subsequently dismissed without prejudice by the Debtors in light of the filing of the initial Complaint. For the avoidance of doubt, nothing herein shall constitute a waiver or limitation of any rights, claims, defenses or objections of the Plaintiff and/or the Debtors' estates with respect to the Removal Motion or any other motions or pleadings filed by any of the Defendants in this action.

[3]      This Amended Complaint has been filed pursuant to a stipulation entered into by the parties (Doc #11). Accordingly, Plaintiff reserves its right to further amend this Amended Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure.

[4]      On August 1, 2022, the Debtors filed a motion in the chapter 11 case [Docket No. 225] seeking, *inter alia*, Court approval to establish a board of independent managers (the "Board") and retain a Chief Restructuring Officer (the "CRO"). If granted, the Independent Manager will resign and the CRO, under the direction of the Board, will have the authority to manage the affairs of each of the Debtors, including the authority to continue the investigation of the circumstances described in this Amended Complaint and take all appropriate actions related thereto.

[5]      The allegations in this Amended Complaint are based upon the documents and information available to Plaintiff at the time of its filing, and are subject to clarification, amendment, revision, or other modification in light of new documents and information, obtained through subsequent discovery in this

9039594 v3

herein, the Debtors are entitled to judgments against the Defendants that will, *inter alia*, sever the relationship between the Debtors and Defendants and return millions of dollars of fraudulently transferred funds to the Debtors.

2.      Thomas "Nick" Salzano ("Salzano") was the "Senior Independent Executive Advisor and Portfolio Construction Manager" at NRIA. Prior to Salzano's arrest in March 2021, and despite never having been an employee of the Debtors, Salzano controlled all dealings between NRIA on the one hand, and either US Construction or Premier on the other, without oversight by NRIA management. Salzano's son, Dustin Salzano, is the Chief Financial Officer of US Construction and owns 51% of US Construction and 48.5% of Premier[6]. The other 49% of US Construction is owned by John Farina, US Construction's President and Chief Executive Officer who also owns 46.5% of Premier.[7]  Historically, Salzano caused Plaintiff to hire US Construction to provide general contractor or construction management services on construction projects located in Philadelphia, Pennsylvania, Brooklyn, New York, and Florida.

3.      NRIA marketed residential projects in the aforementioned geographic locations to individual investors as investment properties. In Philadelphia, NRIA consulted with real estate investors who would purchase property directly from a seller identified by NRIA.  Then, NRIA would engage US Construction and the investors would assume the loans used to finance completion of the property's construction.  NRIA represented to the real estate investors that the completed properties would have an appraised value substantially above purchase price plus debt.

---

action or the chapter 11 cases, or otherwise. No statement in this Amended Complaint is intended to waive or impair any right of the Plaintiff or the Debtors' estates with respect to any of the Defendants or any third parties, and shall not have any estoppel effect with respect to any subsequent action brought against the Defendants or third parties. All rights of the Plaintiff and the Debtors' estates with respect to the Defendants and third parties are expressly reserved.

[6] According to Dustin Salzano's 2016 Schedules K-1.
[7] According to John Farina's 2016 Schedules K-1.

While NRIA was the project manager with respect to the residential projects, US Construction was the general contractor/construction manager. For hundreds of properties, NRIA also advised buyers to hire Premier as the property manager to handle rental and maintenance matters after the property was constructed.  On the other hand, in Florida and Brooklyn, NRIA would develop the properties as part of an overall investment by various investors pursuant to Private Placement Memoranda ("PPM"). After NRIA secured the PPM investors, NRIA would then purchase development properties on behalf of all the investors who would receive a return on their investment after the units were constructed by US Construction and sold.

4.      Until his termination from NRIA, Salzano exercised significant control over the construction activities of the Debtors and was an agent who owed a duty of loyalty to NRIA.

5.      Following the discovery of a fraud carried out by Salzano, for which criminal charges are pending against him before the U.S. District Court for the District of New Jersey, an internal investigation was conducted by the Casey Group Ltd. as "additional" manager for NRIA Partners Portfolio Fund I, LLC, and then Brian J. Casey as the independent manager of the Debtors (the "Independent Manager"). NRIA's internal investigation revealed that the Debtors' prior business relationships with US Construction and Premier resulted in numerous fraudulent conveyances by the Debtors to US Construction, Premier and other entities, and persons. While the internal investigation at NRIA is ongoing, it has already revealed that the Plaintiff and the Defendants entered into transactions and developer agreements with US Construction that constitute fraudulent conveyances and must be avoided.  Plaintiff – through Salzano – also agreed to take financial responsibility for guarantees issued by US Construction and Premier, all without reasonably equivalent value, thereby entitling Debtors to the clawback of millions of dollars. Plaintiff is also entitled to a declaratory judgment to void certain developer agreements between

-4-

Plaintiff and US Construction that were not the product of arms'-length transactions. Instead, they were "sweet-heart" deals arranged by Salzano to benefit his son, US Construction and himself, personally.

6.      As of the date of filing of this Amended Complaint, Plaintiff has identified at least four types of transactions that must be avoided as fraudulent conveyances. First, US Construction and NRIA entered into at least five (5) agreements (collectively, the "GC Agreements"), attached hereto as **Exhibit A through E**, for which the Debtors' estates failed to receive reasonably equivalent value. Under the GC Agreements, NRIA contracted with US Construction for US Construction to provide general contractor services in exchange for payment of fees and commissions upon completion of certain development projects. The GC Agreements relate to projects in Delray Beach, Florida, Pompano Beach, Florida, and Philadelphia, Pennsylvania.

7.      As detailed herein, the GC Agreements must be avoided as fraudulent obligations. In the first instance, the fees charged by US Construction under the GC Agreements were duplicative of fees and commissions charged by other contractors working on the projects or reflected services that could have been performed by NRIA personnel.  In addition, the fees and commissions charged by US Construction were excessive and not reflective of the services to be provided by US Construction in connection with each project. As a result, the Debtors failed to receive reasonably equivalent value for the obligation to pay the contracted-for fees and commissions to US Construction. NRIA also seeks to recover from the Defendants all amounts paid to US Construction under the fraudulent GC Agreements.

8.      Second, NRIA developed residential properties in Philadelphia by coordinating the purchase of as-yet unbuilt units for third parties as investment rental properties. The units were to be constructed by US Construction and managed after completion by Premier Access. As an

inducement to investors, NRIA guaranteed the appraised value of the units upon completion. It also arranged for US Construction to guarantee that the units would be completed on schedule, and for Premier Access to guarantee a minimum "break even" rent revenue for five years after completion.  Salzano agreed on behalf of NRIA, verbally and without documentation, that NRIA would pay for any obligations incurred by US Construction and Premier Access under the schedule and rent guarantees. As a result, the entire market risk of these speculative ventures, as well as the risk of performance by US Construction and Premier Access, was assumed by NRIA while the benefit in terms of payments for construction and property management would be reaped by Dustin Salzano's two majority owned companies. NRIA has made substantial outlays of money under these one-sided agreements between Salzano, purportedly on behalf of NRIA, and his son.

9.      Third, US Construction negotiated the payment of developers' fees by NRIA *prior to the completion* of the various construction projects.  It is industry standard to receive developers' fees *upon completion* of a project.  Finally, the amount of the developers' fees was well-above what constituted appropriate compensation for the work actually performed by US Construction. As a result, the Debtors did not receive reasonably equivalent value for the transfer, thereby requiring avoidance as a classic fraudulent conveyance.

10.      The Debtors are also entitled to a declaratory judgment because the GC Agreements are null and void under New Jersey law given that they were entered by Salzano on behalf of NRIA for the benefit of US Construction in breach of Salzano's fiduciary duty of loyalty to NRIA. Debtors seek a declaratory judgment that: (1) Debtors are under no obligation to pay any developer fee or any other fee to US Construction Inc. under the GC Agreements; (2) all professional contracts and work product reflect that the Debtors are the owner of the properties and related projects, not US Construction; and (3) the Debtors are entitled to compensatory and punitive

-6-

damages to recover for the costs, delays, and injury suffered by the Debtors as a result of the Defendants' failure to perform.

11.     The internal investigation is ongoing, and Plaintiff reserves the right to amend this Amended Complaint as additional facts and information come to light.

## JURISDICTION

12.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, entered on July 23, 1984 and amended on September 18, 2012.

13.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

14.     Venue of this action is proper in the Bankruptcy Court for the District of New Jersey pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The statutory and legal predicates for the relief requested herein are sections 105, 502, 541 544, 548, and 558 of the Bankruptcy Code, Bankruptcy Rules 3007, 6009, and 7001, and D.N.J. LBR 3007-1 and 7003-1.

## PARTIES

16.     Plaintiff, National Realty Investment Advisors, LLC, is a Delaware Limited Liability Company with its principal place of business at 1 Harmon Plaza, Secaucus, NJ 07094. Each of the Debtors also have their principal place of business at 1 Harmon Plaza, Secaucus, NJ 07094.

17.     Defendant U.S. Construction, Inc. d/b/a U.S. Construction, Development & Design, Inc. is upon information and belief a Pennsylvania company[8] with offices located at 70 Hudson Street, Hoboken, NJ, 07030.

18.     Defendant Dustin Salzano is the Chief Financial Officer of US Construction and 51% owner of US Construction and 48.5% owner of Premier and a New Jersey resident.

19.     Defendant John Farina is a 49% owner and officer of US Construction and 46.5% owner of Premier and a New Jersey resident.

20.     Defendant Premier Access Property Management, Inc. is a Delaware corporation with its principal place of business located at 70 Hudson Street, Hoboken, NJ 07030.

## FACTS COMMON TO ALL COUNTS

**I.**     **GC Agreements**

21.     On March 29, 2018, US Construction, Inc., NRIA, and Shovel Ready Projects entered into a *Joint Venture Agreement* regarding a development project at 1901 S. Ocean Boulevard, Delray Beach, Florida (the "Delray Project"). A copy of this agreement and the amendment thereto dated January 15, 2020 are annexed hereto as **Exhibits A and B**, respectively.

22.     As amended, this agreement provides, *inter alia*, that US Construction was to receive a 45% "promoted interest" on net profits of the sale of the related property "for its services as co-developer which include but are not limited to work performed on property acquisition, procuring zoning rights, Project design, construction, construction management, procurement of insurance, and working on sales and marketing." US Construction was recognized as co-developer and would receive this 45% subordinated "promoted interest" in the project after all prior creditors

---

[8]     Upon information and belief, US Construction was formerly incorporated in Nevada.

and investors were paid off. NRIA received no or insufficient consideration for the US Construction promoted interest.

23.     On October 3, 2019, US Construction and NRIA entered into that certain *General Contractor / Construction Management Promoted Interest* agreement. An unsigned copy of this agreement is annexed hereto as **Exhibit C**.

24.     By this agreement, US Construction was to receive, *inter alia*, a percentage share of the profits from the sale of the Debtors' property located at 1901 S. Ocean Boulevard and 1060 Del Harbour Drive in Delray Beach, Florida of between 15% and 40% based upon the net profit generated from the sale of such properties. US Construction was to provide "project management" services that included "(pre) development estimating, design, build, engineering, (pre) marketing . . . and identifying and selecting a major [local] subcontracting company to handle a substantial portion of the build, aside from major trade material / supplier contracting, as well as ongoing project supervision and management of major [local] subcontractor through substantial project completion."

25.     On June 24, 2021, US Construction and NRIA entered into an *Agreement* regarding the Debtors' property at 305 Briny Avenue in Pompano Beach, Florida. A copy of this agreement is annexed hereto as **Exhibit D**.  By this agreement, US Construction was to receive various fees tied to the construction, development, and sale of the property.

26.     On July 20, 2021, US Construction and NRIA entered into an *Agreement* regarding the Debtors' property at 1401 Columbus Boulevard in Philadelphia, Pennsylvania.  A copy of this agreement is annexed hereto as **Exhibit E**.

27.     By this agreement, US Construction was to receive various fees tied to the construction, development, and sale of the property that is reflected on a payment schedule

-9-

attached thereto.  In particular, US Construction was to receive a flat rated development fee in the following amounts: "Phase 1: $1,250,000 (already paid), Phase II: $800,000, Phase III: $800,000."

28.    By way of example only, and without limitation, NRIA and US Construction entered into discussions to develop projects, including, but not limited to, 1901 South Ocean Blvd. in Delray Beach, Florida (a property consisting of 19 condominium units and five single-family houses), 1401 Columbus Blvd. in Philadelphia, Pennsylvania (a property consisting of three phases, including 369 apartment units in Phase I, 331 apartment units in Phase II and 145 to 261 apartment units in Phase III, as well as ground floor commercial space), and 305 Briny Avenue in Pompano Beach, Florida (a property consisting of 40 condominium units with retail space for rent at the location). Instead of performing the general contractor services represented by US Construction's employees, US Construction personnel were only able to perform services that were wholly duplicative of the in-house staff already in place at NRIA. By way of example only, NRIA routinely performs pre-development analyses and preparation for governmental approvals for development projects, such as preparing and reviewing site plan applications. Because of the limitations on US Construction's services under applicable laws, US Construction could only perform services that NRIA already had the capacity to, and did, perform, resulting in needless expense. Similarly, NRIA employs owner's agents to visit the site and monitor progress on behalf of NRIA. US Construction's services amounted to acting as an additional owner's agent, which was duplicative and unnecessary considering NRIA's existing staff and resources, with no benefit to the projects.

29.    The foregoing agreements were negotiated on behalf of NRIA by Salzano without review by NRIA counsel or management, for the benefit of his son's business, US Construction, and also himself.

-10-

30.     US Construction also submitted to NRIA for payment unsupported price increases and change orders, and, upon information and belief, usurped NRIA opportunities and appropriated NRIA assets for US Construction's advantage, contrary to its responsibility as an agent of NRIA.

31.     For example, US Construction agreed to a fixed price contract for the Ocean Delray property in Florida for $44 Million. US Construction's most recent draw request set out a contract price of $53.2 Million. The additional $9.2 Million is from "management directed" change orders, which were approved by Salzano.  Upon information and belief, Salzano approved the $9.2 Million in change orders without supporting documentation. To date, US Construction has been unable to provide the supporting documentation to support the $9.2 Million in change orders.

32.     Each of the contracts were vague, incomplete, and lacking in essential terms, including adequate consideration, the capacity of the parties and mutual manifestation of assent.

## II.     Deeded Property Guaranty Obligations

33.     From approximately 2006 through at least 2018, NRIA developed residential properties at several locations in Philadelphia through an arrangement under which it coordinated with third party real estate investors to buy residential units identified by NRIA, borrow to finance construction of the unit purchased, and roll the construction loan over to a mortgage upon completion (the "Deeded Properties").  Under this scheme, the units would be built by US Construction and construction was ongoing on some of these investment properties as of early 2022. While the real estate investor could in theory select a property manager to collect rents, manage and maintain the units, NRIA recommended that the real estate investor engage Premier Access as property manager.  NRIA marketed the Deeded Properties as a passive investment with an assured return to the real estate investor.

9039594 v3

34.     As an incentive to real estate investors, NRIA, US Construction and Premier offered three guarantees:  (i) NRIA guaranteed that it would buy back property within 90 days of completion if an owner was not satisfied with the appraised value of the property ("Buy Back"); (ii) US Construction guaranteed that it would complete the construction of the property within a scheduled number of payments on the investor's construction loan or pay $80 per day late charge ("Fast Build"); and (iii) Premier guaranteed a minimum rental revenue for five years to cover interest on the buyer's mortgage, insurance and property management fee ("Break Even Rent" and collectively with the Buy Back and Fast Build, the "Guaranty Obligations"). By oral agreement between Salzano, purportedly on behalf of NRIA, NRIA agreed to make payments to investors on behalf of  US Construction and Premier for liabilities that US Construction and Premier incurred pursuant to the Fast Build and Break Even Rent guarantees.  As a result, NRIA assumed the risk of US Construction failing to complete the units within the guaranteed time and the risk of Premier Access being unable to rent the completed units for an amount equal to or greater than the guaranteed rent. NRIA received no consideration or inadequate consideration for assuming these liabilities for the benefit of US Construction and Premier.

35.     Since 2019, pursuant to its Buy Back guarantee, NRIA has purchased at least four properties from dissatisfied investors that were resold for a loss totaling approximately $2,438,051. The investors were unhappy with the end product and its ultimate market value with respect to the units built by US Construction, resulting in NRIA incurring losses despite US Construction's payment in full for all construction related services.

36.     However, upon realizing it did not have the capital to honor the buy back guarantee, rather than purchase the properties from the investors, NRIA did one of two things: either NRIA opted to pay for an investor's carrying costs until the properties were sold, which was already the

contractual obligation of Premier; or NRIA encouraged the investor to reinvest in debtor NRIA

Partners Portfolio Fund I, LLC (the "Fund") in lieu of payment. Under either scenario, NRIA

incurred these expenses as a direct result of US Construction's failure to adequately construct the

properties and/or Premier's failure to honor its rent-guarantee.

37.    Since 2018, with respect to those instances where NRIA agreed to cover the

carrying costs for dissatisfied investors until the properties were re-sold, NRIA has issued

$3,150,069 in payments to make their investors whole. Again, those costs were incurred as a direct

result of investors being dissatisfied with the appraisal of the properties, the construction of the

properties, the rental income of the properties or a combination of the three.

38.    In those instances where NRIA was unable to repurchase the properties from

investors in accordance with the Buy Back guarantee, rather than cover the carrying costs of the

properties, NRIA often encouraged the investor to roll their investment into the Fund in lieu of

payment. Since 2020, NRIA has caused the Fund to credit investors a total of $3,284,402 in lieu

of cash settlements to make the investors whole. Again, those costs were incurred as a direct result

of investors being dissatisfied with the appraisal of the properties, the construction of the

properties, the rental income of the properties (or a combination of the three) in accordance with

the Guarantee Obligations.

39.    With respect to the Fast Build guarantees by US Construction, since 2018, NRIA

has issued $916,089 in payments because of US Construction's failure to abide by the terms of its

contractual obligations with investors. For instance, on or about August 8, 2019, NRIA paid

$15,250 to an investor when a unit located at 634 North 5th Street in Philadelphia was not

completed on-time. As a further example, on or about December 10, 2020, NRIA issued a payment

of $25,860 to an investor for reimbursement of expenses incurred because the Fast Build guarantee

-13-

was not honored at a property located at 1410 South Howard St. in Philadelphia, Pennsylvania.

More recently, an investor/customer, Edgar Stach, sought compensation from US Construction for

delays in construction and overpayments for construction beyond contractual amount for a

property located at 320 Poplar Street in Philadelphia, Pennsylvania. US Construction informed the

investor/customer that NRIA "would be the financially responsible party for any payments you

seeking [sic] related to a Fast Build Guarantee," and that US Construction would investigate the

allegations as to overpayments for construction. When the investor/customer pointed out that the

contractual agreement was with US Construction, not NRIA, US Construction claimed that the

investor/customer owed US Construction money for taking possession of the property absent full

payment, resulting in the investor/customer contacting NRIA to assist with a resolution. A copy

of these email communications is attached hereto as **Exhibit F**.  While NRIA ultimately did not

issue a payment on this particular occasion, NRIA had done so under similar circumstances prior

to May 2022.

     40.    As a result of Premier failing to abide by the terms of their rent-guarantee

agreements with investors, the internal investigation has revealed that NRIA would pay the

investors their monthly amounts, often times in amounts that exceeded the allotted amounts in the

agreements. As just one example, an investor/customer, Sanjay Dhawan, complained about

inflated costs to refurbish a rental unit between tenants and demanded evidence of the costs

expended. NRIA ultimately issued a reimbursement to the investor/customer as a result of

Premier's failure to abide by the terms of the rent-guarantee agreement. Similarly, an

investor/customer, David Thurman, complained to NRIA that he had not received a rental check

from Premier, and Thurman's efforts to contact Premier on numerous occasions had been

unsuccessful. As a result, NRIA issued a check to Thurman in the amount of $15,040 in September

-14-

2019. As a further example, per Salzano's directive, NRIA issued a payment to Premier in the amount of $8,858.20 to make an investor "whole" after US Construction improperly installed a hot water tank heater and Premier failed to issue rent-guarantee payments. A copy of the email correspondence and payment is annexed hereto as **Exhibit G** (Salzano wrote: "[This] owner is an important investor of ours and so NRIA is going to suck up the cost of dealing with this tenant early lease break. We simply want to make sure she is 100% whole with no expense or loss including: loss of rent due to early tenant break[,] repairs[,] hoa [sic] fees for the months[, and] turnover expenses."). Since 2018, NRIA has paid approximately $5,019,350 in payments directly to investors as a result of Premier's failure to make certain payments as a result of the five-year rent guarantee made to investors by Premier.

## IV.    Developers' Fees

41.     In addition to inflated construction costs, US Construction also sought the payment of developers' fees *prior to the completion* of the project which is contrary to industry standards. Moreover, the amount of the developers' fees was not proportionate to the work actually performed by US Construction. For instance, US Construction was paid $1,250,000 to obtain certain permits for the 1401 Columbus project in Philadelphia, something which typically would cost between approximately $100,000-$250,000 for a project of that size.

42.     In the July 20, 2021 Agreement [Exhibit E], US Construction negotiated additional payments of developers' fees for Phases II and III of the construction project, again prior to completion, in the amount of $800,000 for each phase. Such payments would constitute fraudulent conveyances as NRIA would not receive reasonably equivalent value for the services performed by US Construction for such payments. Accordingly, NRIA should not be obligated to make any future developer fee payments to US Construction and this GC agreement should be avoided.

-15-

43.     US Construction has contended it is entitled to an additional $2,000,000 in developers fees for Ocean Delray, but NRIA has refused to pay this additional sum because NRIA has not received reasonably equivalent value for the services performed by US Construction to justify such payment.

**COUNT I**
**AVOIDANCE OF FRAUDULENT OBLIGATIONS**
**11 U.S.C. §§ 544(B) 548, AND 550 AND N.J.S.A. § 25:2-25**
**(AS TO THE GC AGREEMENTS)**

44.     Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

45.     On March 29, 2018, October 3, 2019,[9] June 24, 2021, and July 20, 2021, Plaintiff and US Construction entered into the GC Agreements.

46.     Pursuant to the terms of the GC Agreements, Plaintiff incurred obligations to US Construction regarding the payment of fees and commissions upon completion and sale of the applicable projects.

47.     At, prior to, and after the time of the incurrence of the obligations under the GC Agreements, creditors had claims against Plaintiff.

48.     Upon information and belief, Plaintiff received less than reasonably equivalent value in exchange for the incurrence of the obligations under the GC Agreements because: (i) the services to be provided by the Defendants thereunder were duplicative of services provided by other general contractors and in-house personnel and (ii) the fees and commissions thereunder were excessive and not reflective of the services to be provided by US Construction in connection with each project.

---

[9]     The March 29, 2018 and October 3, 2019 GC Agreements were modified on January 15, 2020.

9039594 v3

49.    Upon information and belief, no later than the time of each obligation: (i) Plaintiff was insolvent or became insolvent as a result of such obligation, (ii) Plaintiff was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Plaintiff was an unreasonably small capital; and/or (iii) Plaintiff intended to incur, believed that it would incur or reasonably should have believed that it would incur, debts that would be beyond Plaintiff's ability to pay as such debts matured.

50.    Upon information and belief, the obligations under the GC Agreements were made with actual intent to hinder, delay and defraud creditors of Debtors by shifting assets from Debtors to US Construction, a business controlled by Dustin Salzano.

51.    Any obligation incurred by Plaintiff with respect to US Construction under the GC Agreements was made within two years before the petition date—June 7, 2020--is voidable pursuant to 11 U.S.C. § 548(a).

52.    Any obligation incurred by Plaintiff with respect to US Construction under the GC Agreements within four years before the petition date—June 7, 2018--is voidable pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-25.

53.    Based upon the foregoing, Plaintiff is entitled to a judgment avoiding each obligation incurred under the GC Agreements.

### COUNT II
### AVOIDANCE OF FRAUDULENT TRANSFERS
### 11 U.S.C. §§ 544(B), 548, AND 550 AND N.J.S.A. § 25:2-25
### (AS TO THE GUARANTY OBLIGATIONS)

54.    Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

55.    The Guaranty Obligations were incurred by Debtors in furtherance of Salzano's plan to impose all of the risk of the Deeded Property development and rental on to Debtors while

-17-

allowing US Construction and Premier Access to obtain fees for the construction and management of the Deeded Property rental units without risk for non-performance.

56.     At, prior to, and after the time of the incurrence of the obligations under the Guaranty Obligations, creditors had claims against Plaintiff.

57.     Upon information and belief, no later than the time of the transfer:  (i) the Plaintiff was insolvent or became insolvent as a result of such transfer, (ii) Plaintiff was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Plaintiff was an unreasonably small capital; and/or (iii) Plaintiff intended to incur, believed that it would incur or reasonably should have believed that it would incur, debts that would be beyond Plaintiff's ability to pay as such debts matured.

58.     Upon information and belief, the transfer was made with actual intent to hinder, delay and defraud creditors of Debtors by shifting assets from Debtors to either US Construction, a business controlled by Dustin Salzano, or Premier, a business that was also partially owned by Dustin Salzano.

59.     Any transfers to US Construction or Premier Access that was made within two years before the petition date—June 7, 2020--are voidable pursuant to 11 U.S.C. § 548(a).

60.     Any transfers made within four years before the petition date—June 7, 2018--are voidable pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-25.

61.     Based upon the foregoing, Plaintiff is entitled to recover the voidable transfers, or the value thereof, from the Defendants under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

9039594 v3

## <u>COUNT III</u>
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (AS TO THE GC AGREEMENTS AND GUARANTY OBLIGATIONS)

62.    Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

63.    At all relevant times, Salzano was an agent of Debtors with respect to their dealings with US Construction and Premier Access.

64.    In that capacity, Salzano had a duty of loyalty to Debtors that required him to act exclusively in Debtors' interest in their dealings with US Construction and Premier Access.

65.    Salzano breached his duty of loyalty by executing agreements with US Construction for no or inadequate consideration and by causing Debtors to assume the Guaranty Obligations of US Construction and Premier Access for no or inadequate consideration, and by causing Debtors to make payments to investors in the Deeded Properties to resolve claims occasioned by the actions or inactions of US Construction and/or Premier Access with respect to the Deeded Properties.

66.    By conspiring with US Construction and Premier Access to exercise his authority for their benefit as opposed to NIRA's benefit, Salzano breached his duty of loyalty with the intent to benefit the two businesses owned primarily by his son Dustin Salzano at the expense of Debtors.

67.    US Construction and Premier Access entered their respective agreements with Debtors knowing that Salzano was breaching his duty of loyalty to Debtors for their benefit.

68.    All agreements between Debtors and US Construction and/or Premier Access entered on behalf of Debtors by Salzano are void by reason of Salzano's breach of his fiduciary duty and the knowing acceptance by US Construction and Premier Access of the benefit of that breach.

-19-

69.     The Defendants knowingly and maliciously participated in Salzano's breach of his fiduciary duty of loyalty for their benefit, justifying an award of punitive damages.

**COUNT IV**
**CIVIL CONSPIRACY**
**(AS TO THE GC AGREEMENTS AND GUARANTY OBLIGATIONS)**

70.     Plaintiff repeats and realleges all prior applicable allegations as though fully set forth herein.

71.     US Construction, Premier Access, Dustin Salzano and John Farina acted in concert with Salzano to enter agreements with NRIA on terms favorable to themselves in breach of Salzano's fiduciary duty of loyalty to NRIA, including the assumption by NRIA of the Guaranty Obligations of US Construction and Premier Access and the fraudulent transfer of the Debtor's assets for the benefit of  US Construction and Premier Access.

72.     Upon information and belief, US Construction, Premier Access, Dustin Salzano and John Farina agreed to commit such acts solely to benefit themselves at the expense of the Debtor.

73.     As a foreseeable result of the foregoing actions, the Debtor has made payments for the benefit of US Construction, Premier Access, Dustin Salzano and John Farina that it was under no legal obligation to make.

74.     As a proximate result of the foregoing actions, the Debtor has suffered damages in an amount to be proven at trial.

75.     Because the actions of US Construction, Premier Access, Dustin Salzano and John Farina by agreement with Salzano were willful, punitive damages are warranted in an amount to be determined at trial.

## COUNT V
## DECLARATORY JUDGMENT
### 28 U.S.C. §§ 2201 and 2202
### (AS TO THE GC AGREEMENTS)

76.     Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

77.     As set forth more fully above, the GC Agreements are invalid, unenforceable, and void, or, in the alternative, have been validly terminated with no further obligation on the part of the Plaintiff, including but not limited to the fact that the GC Agreements are so indefinite as to lack an essential term to constitute an enforceable contract, performance under the contracts would be impracticable, impossible, or illegal, and Plaintiff validly terminated based upon a material breach by Defendant US Construction and failure to perform.

78.     By way of example only, and without limitation, any fee is defined based upon completion of the project, and, to the extent the projects are no longer being pursued, under the definition provided in the agreements, no fee is due to US Construction.

79.     By way of further example only, and without limitation, the GC Agreements do not define the scope of the purported promises or obligations, lacking any definition of the scope of the project, construction, or services, or provisions regarding governmental approvals or financing, and therefore lack essential terms and are insufficiently definite to constitute binding agreements.

80.     By way of further example only, among others, the agreements contain a condition precedent wherein the effectiveness of agreements is contingent upon the project proceeding forward, which did not occur, rendering the agreement ineffective for failure of condition.

81.     By way of further example only, and without limitation, to the extent any project is no longer proceeding forward, among other things, the agreements are unenforceable due to frustration of purpose, impossibility, and impracticability.

-21-

## <u>COUNT VI</u>
## BREACH OF CONTRACT
## (AS TO THE GC AGREEMENTS)

82.     Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

83.     To the extent the agreements with respect to the projects are deemed valid, the various oral representations by the Defendants and written agreements constitute contracts.

84.     The Defendants breached their agreement to satisfy the above-described terms.

85.     Plaintiff was damaged by the Defendants' failure to uphold their end of the bargain, suffering monetary losses in connection with Plaintiff's entry into the agreements for the projects.

86.      The Defendants acted outrageously, maliciously, and with a reckless disregard for the interests of Plaintiff, justifying an award of punitive damages.

## <u>COUNT VII</u>
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
## (AS TO THE GC AGREEMENTS)

87.     Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

88.     In New Jersey, every contract contains an implied covenant of good faith and fair dealing: that every party to the contract must act in good faith and deal fairly with the other party in performing or enforcing the terms of the contract, and within the reasonable expectations of the parties.

89.     To the extent deemed valid, the various oral and written representations by the Defendants constitute contracts.

90.     The Defendants exercised their discretion arbitrarily, capriciously, and in manner inconsistent with reasonable expectations of the parties, and for an improper purpose of harming Plaintiff's interests for the benefit of Defendants.

-22-

91.    The Defendants have breached their duty of good faith and fair dealing to Plaintiff by acting maliciously, in bad faith, for the purpose of depriving Plaintiff of the benefit of the bargain.

92.    Such unfair and bad faith conduct by Defendants has proximately caused economic injury and other damages to Plaintiff.

93.    The Defendants acted outrageously, maliciously, and with a reckless disregard for the interests of Plaintiff, justifying an award of punitive damages.

## COUNT VIII
## UNJUST ENRICHMENT
## (AS TO THE GC AGREEMENTS)

94.    Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

95.    The Defendants have illegally profited from fees and diverted income the projects. It is unjust for the Defendants to retain the benefits conferred upon them by Plaintiff.

96.    As a consequence, Plaintiff has suffered and continues to suffer economic losses and injuries.

## COUNT IX
## TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO SECTION 542(B) OF THE BANKRUPTCY CODE
## (AGAINST ALL DEFENDANTS)

97.    Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

98.    The funds that the Defendants received from NRIA was the property of NRIA and is now the property of the Debtor's estate.

99.    The funds that the Defendants received from NRIA is of consequential value and benefit to the estate.

9039594 v3

100.    The funds that the Defendants received from NIRA is property that the Debtors may use pursuant to Section 363 of the Bankruptcy Code.

101.    Because US Construction and Premier have not provided any form of consideration in exchange for the funds, the Defendants owe NRIA, and transitively the estate, a debt.

102.    Based on the foregoing, the Plaintiff is entitled to turnover of the cash that the Defendants accepted from NRIA under 11 U.S.C. § 542, together with an award of pre-and post-judgement interest thereon from the date of demand to the date of payment and the cost of this action.

## COUNT X
## DISALLOWANCE OF ALL CLAIMS
## 11 U.S.C. § 502(d)
## (AS TO EACH DEFENDANT)

103.    Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

104.    Pursuant to section 502(d) of the Bankruptcy Code, Plaintiff objects to the allowance of any claim filed by or scheduled on behalf of any Defendants (whether in their capacity as receiving a fraudulent transfer and/or preferential payment) that has been named in any of Counts 1 through VIII.

105.    Pursuant to section 502(d) of the Bankruptcy Code, to the extent property is recoverable from any Defendant under sections 544(b) or 548 of the Bankruptcy Code, any and all claims of such Defendants and/or their assignee against the Debtors must be disallowed until such time as the applicable Defendant pays Plaintiff the amounts and/or returned the property subject to avoidance.

9039594 v3

## COUNT XI
## EQUITABLE SUBORDINATION
## (AS TO ALL DEFENDANTS)

106. Plaintiff repeats and realleges all prior applicable allegations as if fully set forth herein.

107. To the extent any Defendants have filed one or more proofs of claim or to the extent the Debtors have scheduled or will schedule a claim in favor of any Defendants, such claims, to the extent not otherwise disallowed, should be equitably subordinated to the claims of the Debtors' general unsecured creditors.

108. As set forth herein, each of the Defendants engaged in, and benefitted from, a pattern of misconduct and inequitable conduct at the expense of the Plaintiff, its estate and its stakeholders, including unsecured creditors, including by the allegations set forth against each such Defendants in Counts I through IX.

109. Under the principles of equitable subordination, any claim scheduled in favor of or filed by the Defendants are subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

110. Equitable subordination of any claims of the Defendants is consistent with the provisions and purposes of the Bankruptcy Code.

111. Accordingly, any claim of a Defendant is subject to equitable subordination.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests entry of a final judgment against the Defendants as follows:

112. On Count 1 and Count 2, awarding judgment in favor of Plaintiff and against the Defendants, (i) avoiding all fraudulent transfers and obligations (the "Avoidable Transfers") against the Defendants, (ii) avoiding all Avoidable Transfers and directing the Defendants to return

-25-

to Plaintiff the amount of the Avoidable Transfers, pursuant to 11 U.S.C. §§ 544(b), 548(a), 549, and/or 550(a), and (iii) for money damages against the Defendants in the amount of the Avoidable Transfers, together with interest from the date of demand at the maximum legal rate, to the extent allowed by law;

113.    On Count 3 through Count 8, awarding judgment in favor of Plaintiff and against the Defendants for breach of fiduciary duty, declaratory judgment, breach of contract, breach of good faith and fair dealing, and unjust enrichment.

114.    On Count 9, awarding judgment in favor of Plaintiff and against the Defendants to turnover of the cash that Defendants accepted from NRIA under 11 U.S.C. § 542, together with an award of pre-and post-judgement interest thereon from the date of demand to the date of payment and the cost of this action.

115.    On Count 10, awarding judgment in favor of Plaintiff for disallowing any claims held or filed by the Defendants against the Debtors until the relevant Defendant pays Plaintiff an amount equal to the Avoidable Transfers pursuant to 11 U.S.C. § 502(d);

116.    On Count 11, equitably subordinating any proof of claim filed by or scheduled on behalf of the Defendants to the claims of general unsecured creditors;

117.    Awarding Plaintiff compensatory damages;

118.    Awarding Plaintiff attorney's fees to the extent permitted by law;

119.    Awarding Plaintiff interest and cost of suit;

120.    Awarding Plaintiff punitive damages; and

121.    Awarding such other and further relief as the Court deems just and proper.

Dated: October 17, 2022                    **SILLS CUMMIS & GROSS P.C.**

*/s/ S. Jason Teele, Esq.*
James Hirschhorn, Esq.
Mary E. Toscano, Esq.
S. Jason Teele, Esq.
Daniel J. Harris, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000 (Telephone)
jhirschhorn@sillscummis.com
mtoscano@sillscummis.com
steele@sillscummis.com
dharris@sillscummis.com

*Counsel to the Debtors and Debtors-in-Possession*

9039594 v3